The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Employer-Employee relationship existed between the plaintiff and the Defendant-Employer.
3. The Liberty Mutual Insurance Company was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $308.32, which yields a compensation rate of $205.56 per week.
5. Plaintiff suffered an injury by accident on May 7, 1993, when she fell from a ladder and injured her right side, hip, and lower back.
6. The issue to be determined by the Commission is whether there is a causal connection between plaintiff's original injury by accident and her present condition.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff began her employment with Defendant-Employer on April 13, 1993. On May 7, 1993, while cleaning storage feeders, plaintiff fell backwards off a two-to-three foot ladder. A Form 21 Agreement for Compensation for Disability for this accident was approved by the Industrial Commission on June 15, 1993, providing a compensation rate of $205.56 for temporary total disability benefits beginning on May 14, 1993. A Form 28B, dated June 23, 1993, provided that temporary total disability benefits were provided by the employer May 7, 1993, through June 7, 1993.
2. Immediately following her May 7, 1993, accident, plaintiff sought medical treatment in the emergency department of the Wake Medical Center in Raleigh, North Carolina. The emergency room records state that plaintiff suffered a lower back trauma secondary to a fall. Plaintiff was prescribed bed rest for the next 4-5 days and a prescription of Percocet for pain. It was recommended to plaintiff that she call Raleigh Orthopaedics if there was no improvement in her pain.
3. On May 11, 1993, plaintiff first presented to Dr. Tom S. Rand of the Wilson Orthopaedic Surgery and Neurology Center in Wilson, North Carolina. Dr. Rand took x-rays, but the x-rays did not show a fracture of the coccyx so Dr. Rand then decided to obtain a bone scan. The bone scan was also negative for a fractured coccyx. Plaintiff returned to Dr. Rand on May 18, 1993, complaining of gastrointestinal problems. Dr. Rand referred plaintiff to Dr. Jerry C. Woodard, M.D., a gastroenterologist in Wilson, North Carolina. There is no indication in Dr. Rand's May 18, 1993, note of any continuing complaints by plaintiff of low back pain related to her accident.
4. Plaintiff thereafter returned to Dr. Rand on May 27, 1993. Although she complained to Dr. Rand of "mild tightness in her back," Dr. Rand stated that the patient "is doing better." Furthermore, Dr. Rand testified that plaintiff was "significantly better" and that she could be returned to work with some lifting restrictions during the next week.
5. Plaintiff returned to Dr. Rand on June 1, 1993, at which time plaintiff was continuing to improve and was allowed to resume light work with no heavy lifting. Although plaintiff was doing better on June 1, Dr. Rand wanted to restrict her to light work to protect her back from further injury.
6. On July 1, 1993, plaintiff once again returned to Dr. Rand. Dr. Rand's note of the July 1, 1993, visit and his deposition testimony indicate that plaintiff presented complaining of a bad cold, but that her back was doing much better. She complained of stiffness in the morning but had good range of motion, was on no medication at this point and took extra strength Tylenol on an as-needed basis. Dr. Rand gave plaintiff a prescription for Darvocet to take as she needed it in order to rest in the evening. Dr. Rand's note of July 1, 1993, further states in unequivocal terms that "plaintiff is able to do her job."
7. Plaintiff later contacted Dr. Rand by telephone on July 7, 1993, stating that she had been unable to work from June 29 through July 2, 1993, allegedly due to her back problems. Dr. Rand provided plaintiff with a note authorizing her to be out of work from June 29 through July 2, 1993. However, unbeknownst to Dr. Rand, plaintiff had been previously discharged from Naomi Knitting Mills, effective June 29, 1993, for unsatisfactory "work, attitude and attendance." The termination form for plaintiff indicates that plaintiff had three unexcused absences on April 19, 1993, June 21, 1993 and June 29, 1993.
8. At some point later in July of 1993, plaintiff was shot twice in a drive-by shooting incident. Plaintiff has two bullets lodged in the left paraspinal region of her back. Expert testimony indicates that the bullets lodged in this region of plaintiff's back are unrelated to her current condition.
9. On January 4, 1994, plaintiff later returned to work with another employer, Moortex Company. At no times between her last visit to Dr. Rand on July 1, 1993, and her beginning employment with Moortex did she seek medical treatment for any complaints related to her initial compensable injury of May 7, 1993. However, several weeks after beginning work at Moortex, plaintiff first presented to Dr. Rand's partner, Dr. Gerald C. Vanden Bosch, complaining of low back pain. His exam showed a tender, low lumbosacral spine area. At no time during this visit or during her visits to the Wake Medical Center emergency room or to Dr. Rand in May-July, 1993, did plaintiff ever complain of pain radiating from her lower back to her extremities, including her thighs and legs. Dr. Rand testified that "She, at no time that we saw her — that I saw her, had symptoms that would suggest that type of pain." If plaintiff had expressed these complaints during the period of time she sought treatment from Dr. Rand, he further testified that he would have ordered an MRI scan.
10. Following plaintiff's January 21, 1994, visit to Dr. Vanden Bosch, the doctor ordered an MRI of her lower spine to evaluate her lower back complaints. The MRI was not performed due to the two bullets lodged in her spinal area. Plaintiff therefore returned to Dr. Vanden Bosch on February 7, 1994, still complaining of right lower back pain for which anti-inflammatories had provided no relief. Dr. Vanden Bosch did note point tenderness over the right posterior superior iliac spine which seemed to reproduce her symptoms. He therefore injected that particular point with a combination of cortisone preparation and a long-acting novocaine.
11. Plaintiff returned to Dr. Vanden Bosch on April 15, 1994. Although the injection helped to relieve her pain, she continued to have occasional discomfort, but that pain was not severe in the intervening two months. Dr. Vanden Bosch recorded in his April 15 note that "Plaintiff has had a large increase in her right lower back pain since April. Before that time she had some occasional discomfort but not severe. Since the beginning of April she has had fairly severe discomfort right lower back radiating into the right thigh."
12. This is the first indication in plaintiff's entire medical record of pain radiating into her legs and, coincidentally enough, this complaint only occurred after she had been working for several months with another employer. As a result of those complaints, Dr. Vanden Bosch ordered a myelogram and post-myelogram CAT scan. These two tests revealed "a minimal central annular bulge at L3-4, and a central disc herniation at L5-S1." When a patient has a herniated disc, the usual signs and symptoms relate to pressure on the nerves by the herniated disc. This produces primary leg pain with pain radiating down into the legs. A herniated disc can also cause bladder dysfunction, bowel dysfunction, numbness, weakness, loss of reflexes and other symptoms, none of which plaintiff exhibited at any time in 1993, well before her April 26, 1994, diagnosis of disc herniation by Drs. Melvin and Vanden Bosch. Even Dr. Vanden Bosch's January 21, 1994, note indicates that plaintiff was "without significant radiation" and that she denied "any numbness, weakness or paresthesias."
13. The only evidence of record suggesting that plaintiff had any of these signs and/or symptoms of disc herniation between her compensable May 7, 1993, injury and the April 26, 1994, myelogram and CAT scan is her hearing testimony wherein she claimed to have suffered significant lower back pain throughout the intervening seven month period. However, there is no objective medical evidence or testimony from any unbiased witness that plaintiff had any lower back pain between July 1, 1993 and her initial visit to Dr. Vanden Bosch on January 21, 1994.
14. In fact Dr. Vanden Bosch conceded in his deposition testimony that his opinion that her current medical condition is causally related to her May 7, 1993, workplace accident is entirely dependent upon the credibility of Ms. Mercer in presenting those symptoms to him on January 21, 1994. Such testimony, however, as presented by Ms. Mercer, is entirely contrary to the medical notes and deposition testimony of Dr. Rand, her initial treating physician, following the workplace accident of May 7, 1993. As such, Dr. Rand's objective testimony as to the plaintiff's complaints and symptoms during the two months following her compensable injury suggests that plaintiff was not suffering a disc herniation.
15. There is insufficient evidence of record from which to prove by its greater weight that plaintiff's present condition is causally related to the compensable injury by accident.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Where plaintiff did not seek any further medical treatment as a result of her compensable injury of May 7, 1993, until her first visit with Dr. Vanden Bosch seven months later, plaintiff cannot meet her burden of establishing a causal connection between her herniated disc problems of early 1994 and her compensable injury in May, 1993. The North Carolina Supreme Court has stated unequivocally that, because of the "difficulty of pinpointing the precise causative factors of disc injuries," workers' compensation plaintiffs must employ expert medical testimony establishing the "causal relationship between a specific trauma and the rupture of an intervertebral disc." Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980). Therefore, in view of plaintiff's medical history, Dr. Vanden Bosch's testimony that he believes plaintiff's current condition is related to May 7, 1993, injury, based on nothing more than the history given to him by the plaintiff is not sufficient to establish the necessary causal relationship where there is no expert medical testimony documenting any objective or subjective signs or symptoms of a disc herniation between plaintiff's May 7, 1993, injury and her January 21, 1994, initial visit to Dr. Vanden Bosch, some seven months afterwards.
2. Because plaintiff did not carry her burden of proof in this matter, she cannot prevail. Click v. Freight Carriers,300 N.C. 164, 265 S.E.2d 389 (1980).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
ORDER
1. Plaintiff's claim for further workers' compensation benefits is HEREBY DENIED.
2. Each side shall pay its own costs.
 S/ _______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _______________________ DIANNE S. SELLERS COMMISSIONER